**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| AMIE H. GARCIA, | ) |
| | ) |
| Plaintiff, | )   **CIVIL ACTION** |
| | ) |
| v. | )   No.  04-1159-MLB |
| | ) |
| HAMILTON COUNTY HOSPITAL, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant Dr. Martin Sellberg's motion for summary judgment. (Doc. 41.)  The motion has been fully briefed and is ripe for decision.  (Docs. 42, 66, 78.) Plaintiff asserts claims against Sellberg for ordinary negligence, gross negligence and wanton conduct, and wrongful death resulting from his participation in the medical treatment of Traci Rhea Garcia. Sellberg asserts that he has statutory immunity for ordinary negligence under K.S.A. § 65-6124(a), (e), and that there is no evidence to support a finding of wantonness on his part.  Plaintiff counters that Sellberg's conduct did not fall within the scope of immunity granted under K.S.A. § 65-6124, and that, in any event, there is sufficient evidence to create a triable issue as to gross negligence or wantonness.  Sellberg's motion is GRANTED in part, and DENIED in part for reasons set forth herein.

**I.  FACTS AND PROCEDURAL HISTORY**

This is essentially a continuation of a previous case, which was dismissed at the summary judgment stage.  <u>Garcia v. Polich</u>, No. 00-1231-MLB, Doc. 383 (D. Kan. Jan. 30, 2004) (<u>Garcia I</u>).  In that case,

plaintiff invoked this court's subject matter jurisdiction based on a federal question arising under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.    The court granted summary judgment to defendant St. Catherine Hospital on the EMTALA claim, and declined to exercise supplemental jurisdiction over the remainder of the case, which was based solely on state law claims related to medical malpractice.    Garcia I.    Subsequent to that ruling, the case was refiled with Traci Garcia's daughter, Amie Garcia, as the plaintiff.    Amie resides in Texas; therefore, the case arises under federal diversity jurisdiction.    Unless otherwise noted, the following facts are based on Garcia I.[1]

Traci Garcia, plaintiff's decedent, had her third child by caesarian section on June 3, 1998 at Southwest Medical Center in Liberal, Kansas. Mrs. Garcia was discharged to home and approximately one week later, she began to experience multiple problems. On the morning of June 13, she went to the emergency room at Hamilton County Hospital in Syracuse, Kansas.    Mrs. Garcia was admitted to Hamilton County Hospital by Dr. Romeo Arribas.

In the evening hours of June 13, Dr. Arribas contacted Dr. Ann Polich at St. Catherine Hospital in Garden City regarding Mrs. Garcia's situation.    Dr. Polich told Dr. Arribas to send Mrs. Garcia directly to Wichita.    This did not happen.    Instead, Dr. Arribas

---

[1] In relying on the facts found in Garcia I, the court expresses no opinion regarding whether Garcia I has any binding effect on this case.    Rather, for sake of convenience, the court simply recounts its own factual summary as provided in Garcia I.    It does not appear that these facts are seriously in dispute.    In any event, should any party feel that reliance on facts from Garcia I is misplaced, they are free to raise the issue when and if it becomes appropriate.

called Dr. Polich again at approximately 2:00 a.m. on June 14.  Dr. Arribas expressed his opinion that Mrs. Garcia could be cared for at St. Catherine.   Dr. Polich  agreed  to  accept  Mrs.  Garcia  at  St. Catherine upon her transfer from Hamilton County Hospital.

Mrs. Garcia arrived at St. Catherine at approximately 3:45 a.m. on June 14, where she was examined in the emergency room by William D. Strampel, D.O., an emergency room physician.   Dr. Strampel's initial  diagnosis  was  Adult  Respiratory  Distress  Syndrome.   He concluded that Mrs. Garcia's condition constituted an emergency and that she needed to be admitted or transferred.  However, because Dr. Strampel was not authorized to admit or transfer Mrs. Garcia, that decision fell to the attending physician, Dr. Polich.

Dr.  Strampel  called  Dr.  Polich  from  the  emergency  room  and reported the situation.  Dr. Polich immediately came to the hospital, arriving at 4:20 a.m.  She examined Mrs. Garcia, reviewed x-rays and available  lab  test  results  and  spoke  with  Dr.  Strampel.    Both physicians  recognized  that  Mrs.  Garcia's  situation  presented  an emergency medical condition.  Plaintiff argues that Mrs. Garcia should have  been  intubated  prior  to  transfer  in  order  to  stabilize  Mrs. Garcia's condition.  Dr. Polich knew that if she elected to admit Mrs. Garcia,  St.  Catherine  had  the  capability  to  intubate  her.   In  Dr. Polich's  opinion,  however,  Mrs.  Garcia  needed  complex  ventilator management  which  was  not  within  the  capability  of  St.  Catherine. Plaintiff does not dispute Dr. Polich's judgment in this regard.  Dr. Polich determined that Mrs. Garcia was stable and almost immediately ordered her transfer by air to Via Christi Hospital in Wichita.  Via Christi agreed to accept Mrs. Garcia.  There is no issue regarding Via

Christi's capacity to treat Mrs. Garcia.

Dr. Polich prepared an acute transfer certificate, which stated that the transfer was based on "further pulmonary evaluation" and that the risks of transfer were "accident/death." Gregg Garcia, Traci's husband, was told by Dr. Polich that Mrs. Garcia could die. Gregg signed the consent section of the certificate which read:

### Consent to Transfer

I hereby consent to transfer to another medical facility. I understand that it is the opinion of the physician responsible for my care that the benefits of transfer outweigh the risks of transfer. I have been informed of the risks and benefits upon which this transfer is being made. I have considered these risks and benefits and consent to transfer. I consent to the release of information to the receiving facility and physician as deemed necessary.

In order to effect the transfer, Dr. Polich contacted EagleMed, an air ambulance service. EagleMed apparently had an air ambulance at the Finney County Airport. The aircraft was manned by defendants Douglas Landgraf and Lawrence McGowan, both of whom were registered nurses and mobile intensive care technicians. Sometime around 5:00 a.m. on June 14 Polich spoke by telephone with Landgraf and EagleMed's medical advisor, Dr. Sellberg. Polich informed Sellberg of Traci's condition, after which Sellberg gave Landgraf certain orders regarding Traci's treatment during transport to Wichita. Thereafter, Traci Garcia was transported to Finney County Airport via EMS. (Doc. 42 at 5-6.)

From the airport, Traci was flown to Wichita aboard an EagleMed aircraft. Unfortunately, during the flight she suffered a cardio-pulmonary arrest. Landgraf and McGowan attempted to intubate her, but were unable to secure an airway. They performed CPR on her for the

-4-

remainder of the flight to Wichita, and the subsequent ground ambulance transport to Via Christi - St. Francis Hospital. Although Traci Garcia survived through June 14th, it appears that her brain function never returned. She was pronounced dead the following day. (Doc. 66 at 10.)

## II.   SUMMARY JUDGMENT STANDARD: FRCP 56

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

## III.   ANALYSIS

Plaintiff brings three claims against Sellberg: (1) ordinary negligence; (2) gross negligence and wanton conduct; and (3) wrongful

-5-

death.[2]  (Doc. 1 at 8-10.)  The wrongful death count is premised on a finding of fault under either of the first two claims.  Accordingly, Sellberg argues that he is statutorily immune from ordinary negligence, and that plaintiff has failed to produce evidence from which a jury could find that he was grossly negligent or wanton. Therefore, he argues, he is entitled to summary judgment on all claims.

A.   Immunity from Ordinary Negligence

K.S.A. 65-6124 provides, in relevant part, as follows:

> (a) No physician . . . who gives emergency instructions to a mobile intensive care technician . . . during an emergency, shall be liable for any civil damages as a result of issuing the instructions, except such damages which may result from gross negligence in giving such instructions.
>
> . . . .
>
> (e) No medical adviser who reviews, approves and monitors the activities of attendants shall be liable for any civil damages as a result of such review, approval or monitoring, except such damages which may result from gross negligence in such review, approval or monitoring.

Sellberg contends that either of these provisions is sufficient to confer upon him immunity from claims of ordinary negligence under the facts of this case.

Plaintiff responds that, because Traci Garcia was already

---

[2] In a half-hearted effort to avoid the immunity provisions of K.S.A. 65-6124, plaintiff modified the language of her first claim to assert that, while other defendants were accused of ordinary negligence, Sellberg, Landgraf, and McGowan were accused of gross negligence.  (Doc. 1 at 8.)  The court declines to read count one as asserting anything other than ordinary negligence.  Otherwise, count one would be redundant to count two, which attempts to state a claim for gross negligence and wanton conduct against these defendants.

present at St. Catherine Hospital, and under Dr. Polich's care, there was no emergency.  Thus, says plaintiff, the provisions of section 6124(a) do not apply to Sellberg.  In support of that argument, plaintiff cites a considerable volume of case law that purports to define the term emergency.  Applying that definition to the case at bar, plaintiff then argues that these facts do not meet the legal definition of "emergency."  (Doc. 66 at 13-18.)

        Plaintiff has a problem.  Sellberg asserted in his statement of facts that "[w]hile at St. Catherine and during the phone call with Dr. Sellberg, Traci Garcia was a patient of St. Catherine Hospital, had an <u>emergency medical condition</u> and was critically ill."  (Doc. 42 at 7 (emphasis added).)  Nowhere in her response brief did plaintiff dispute this fact.  Pursuant to Local Rule 56.1(a), "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."  <u>See also</u>, Fed. R. Civ. P. 56(e).  "Emergency medical condition" is a material fact.  Therefore, it is established for purposes of this motion that Traci Garcia had an "emergency medical condition" at the time of her transfer from St. Catherine to EagleMed.  Moreover, the court declines to discern a distinction between the more general term, "emergency," as used in K.S.A. 65-6124, and the more specific term "emergency medical condition."  Rather, the court finds that an emergency medical condition can be viewed in one of two ways: (1) an emergency medical condition may be considered one specific type of emergency contemplated by the statute; or, more likely, (2) an emergency medical condition is precisely the type of emergency contemplated by the

statute.  With regard to this latter view, it is noteworthy that the preamble to the act under which section 65-6124 originated states, "An Act concerning the regulation of <u>emergency medical service</u> . . . ." Act of Apr. 7, 1988, 1988 Kan. Laws 1477 (emphasis added).  Further review of the act shows that it deals exclusively with emergency medical matters.  Accordingly, it makes sense to conclude that an emergency medical condition is specifically the sort of "emergency" the legislature had in mind when enacting this immunity provision. Thus, for purposes of this motion, it is deemed established that an emergency existed.

Looking to the remainder of section 65-6124(a), there is no serious contention regarding the fact that Sellberg was a physician giving instructions to mobile intensive care technicians (Landgraf and McGowan).  Since the matter was deemed an emergency and the instructions related directly to the care of the patient, the court further concludes that these instructions amounted to "emergency instructions," as contemplated by the statute.  Therefore, Sellberg falls squarely within the statute's grant of immunity from claims of ordinary negligence related to his instructions.

Likewise, it is undisputed that Sellberg was EagleMed's medical advisor.  Hence, to the extent plaintiff asserts that he was negligent regarding any acts or omissions not covered by 6124(a) (granting immunity for ordinary negligence arising from his instructions), Sellberg is also entitled to immunity for ordinary negligence under 6124(e) (granting immunity for ordinary negligence arising from his "review, approval, or monitoring" of Landgraf and McGowan). Sellberg's motion is therefore GRANTED as to claims of ordinary

-8-

negligence.

    B.  Gross Negligence and Wanton Conduct

    While K.S.A. 65-6124(a) and (e) provide immunity for ordinary negligence, those provisions expressly preserve liability for gross negligence.  Sellberg argues that, under Kansas law, degrees of negligence have been abolished, and gross negligence is synonymous with wanton conduct.  He further contends that plaintiff lacks sufficient evidence on the critical elements of a claim of wantonness. Plaintiff counters that the plain language of the statute evinces a legislative intent to revive degrees of negligence, at least as to gross negligence; and, in any event, there is more than sufficient evidence from which a jury could find gross negligence or wanton conduct.

    For almost a century, degrees of negligence have been abolished in this state.  Mo. Pac. Ry. Co. v. Walters, 78 Kan. 39, 40-41, 96 P. 346, 347 (1908); see also Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co., 868 F. Supp. 1244, 1251 (D. Kan. 1994); Butler Mfg. Co. v. Americold Corp., 835 F. Supp. 1274, 1276 n.2 (D. Kan. 1993); Holman v. Southwestern Bell Tel. Co., 358 F. Supp. 727, 729 n.1 (D. Kan. 1973); Muhn v. Schell, 196 Kan. 713, 715, 413 P.2d 997, 1000 (1966); Srajer v. Schwartzman, 164 Kan. 241, 248, 188 P.2d 971, 976 (1948); Kniffen v. Hercules Powder Co., 164 Kan. 196, 206, 188 P.2d 980, 987 (1948); PIK-Civil 3d § 103.03 cmt.  Walters made clear that distinctions between ordinary and gross negligence were unworkable. The concept was simply too esoteric for lawyers, judges, and, most importantly, jurors to readily comprehend and apply.  As a result, gross negligence has been held synonymous with wanton conduct, even

in cases where both terms were used.  See <u>Muhn</u>, 196 Kan. at 715-16, 413 P.2d at 1000; <u>Srajer</u>, 164 Kan. at 248-50, 188 P.2d at 975-76 (defining "gross and wanton negligence" exclusively in terms of wantonness).

Nonetheless, plaintiff contends that the legislature revived gross negligence as a distinct degree of negligence through its choice of wording in K.S.A. 65-6124.  Plaintiff points out that in section 6124(b), the legislature granted immunity to medical intensive care technicians, with an exception for damages resulting from that person's "gross negligence or by willful or wanton acts or omissions." Plaintiff argues that the plain language of this provision evinces a clear distinction between gross negligence and wantonness. Furthermore, plaintiff argues, this distinction should be applied to subsections (a) and (e) of K.S.A. 65-6124, such that the term "gross negligence" used there should be construed as something apart from wanton conduct.  Indeed, the court agrees that this statutory language might be construed as distinguishing gross negligence from wantonness. On the other hand, the legislature is presumed to be aware that at the time it enacted section 6124, gross negligence had been abolished and generally equated with wanton conduct for over half a century.  See <u>Beck v. Prupis</u>, 529 U.S. 494, 500-01, 120 S. Ct. 1608, 1613, 146 L. Ed. 2d 561 (2000).  Moreover, when the legislature uses terms that have an established legal meaning, it is presumed that this meaning continues unless the statute specifically indicates otherwise.  See <u>id.</u>; <u>Clackamas Gastroenterology Assocs., P. C. v. Wells</u>, 538 U.S. 440, 447, 123 S. Ct. 1673, 1679, 155 L. Ed. 2d 615 (2003); <u>Leyerly v. United States</u>, 162 F.2d 79, 85 (10th Cir. 1947).

-10-

In this case, although the legislature provided a lengthy definitions section for terms used in this act, K.S.A. 65-6112, it did not include a definition for gross negligence.  In the absence of legislative history which clearly indicates that the legislature intended to revive (but not define) gross negligence in this limited situation, the court will not assume that the legislature intended to overrule almost a century of legal precedent with such a subtle stroke of the pen.

Regardless, the court need not answer that question in order to decide this motion.  Even assuming that gross negligence is synonymous with wanton conduct, construing the evidence in the light most favorable to plaintiff, there are facts from which a jury could conclude that Sellberg exhibited wanton conduct in this case.  Under Kansas law, "[a]n act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act."  PIK-Civil 3d § 103.03.  This definition is consistent with the case law discussing wantonness and gross negligence.  See Muhn, 196 Kan. at 715, 413 P.2d at 1000.  Furthermore, a claim of wanton conduct can seldom be resolved on summary judgment, but must usually be resolved by a jury.  Wolfgang v. Mid-Am. Motorsports, Inc., 898 F. Supp. 783, 791 (D. Kan. 1995); Gruhin v. City of Overland Park, 17 Kan. App. 2d 388, 392, 836 P.2d 1222, 1225 (1992).

Construing the facts in the light most favorable to plaintiff, it is possible that a jury could conclude that some or all of the following facts existed.  While knowing the gravity of Traci Garcia's medical condition, particularly with respect to her respiratory

-11-

situation, Sellberg rejected Landgraf's request to have her intubated prior to transport.[3]   (Doc. 66 at 2.)   Sellberg also made this decision knowing that he would likely have difficulty establishing communications with Landgraf and McGowan during the flight because the communication systems in use on the aircraft did not provide reliable contact with the ground.  Id. at 3-4.[4]

Additionally, Sellberg ordered that if intubation was necessary, Landgraf and McGowan could use as much Valium as necessary to accomplish the procedure.  Id. at 2.  However, Landgraf had never intubated a conscious patient, and had never used Valium during any intubation.  Id. at 4.  Similarly, McGowan had only done one or two intubations on conscious patients, and was aware of none in which Valium was administered.  Id.  Since Sellberg was responsible for ensuring that Landgraf and McGowan had proper training and experience, id. at 6-7, a jury could find that Sellberg declined the request to intubate at St. Catherine's, all the while knowing that neither

---

[3] Sellberg makes much of the idea that he could not order Traci Garcia to be intubated while she was under the care of another physician at St. Catherine Hospital.  (Docs. 42 at 23; 78 at 9.) However, Sellberg fails to address the question of why he could not direct his own personnel, Landgraf and McGowan, to intubate Traci Garcia after she had been transferred to their custody, but before leaving St. Catherine Hospital.  Neither does he address whether he could simply have refused to accept her until Dr. Polich had her intubated.

[4] A key fact in this regard would have been Sellberg's admission that he was aware of these communication problems.  Unfortunately, plaintiff provides no evidence to support this contention.  (Doc. 66 at 4 ¶ 14.)  Instead, plaintiff cites to two pages of Sellberg's deposition, the first of which is missing and the second does not address this matter.  Nonetheless, there is ample evidence that the pilot, Landgraf, and EagleMed's Program Director were aware of the communication problems.  Construing these facts in the light most favorable to plaintiff, a jury might infer that this information was so well known within EagleMed that Sellberg had to be aware of it.

Landgraf nor McGowan had any experience in performing such a procedure on a conscious patient, using Valium, and onboard an aircraft. Finally, as to the use of Valium, there is evidence from which a jury could conclude that the use of Valium was a non-standard practice when intubating patients, and that an open-ended order to use as much Valium as required might have been particularly egregious.  Id. at 3, 7, 10.)

In sum, taking all these facts into consideration, a jury could conclude that Sellberg was aware of the dangers of placing a patient in Traci Garcia's condition aboard an aircraft, without intubation, with unreliable ground communication, with inadequately trained attendants, and with orders to administer as much Valium as necessary to accomplish any necessary intubation.  Indeed, by Sellberg's own admission, he was aware that Traci Garcia "was obviously critically ill and had the potential to deteriorate during transport by nature of the disease process." (Doc. 42 at 6 ¶ 7.)  The jury might further conclude that, since Landgraf had requested pre-flight intubation, and since Sellberg was aware of her compromised respiratory condition, and since the aircraft had the capability of transporting a patient on a ventilator, that Sellberg's refusal to direct pre-transport intubation amounted to reckless disregard or complete indifference toward the probable consequences of his decision.  Accordingly, Sellberg's motion is DENIED as to the remaining claims.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged.  The standards governing motions to reconsider are well established.  A motion to reconsider is appropriate where the court has obviously misapprehended a party's

position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this  25th  day of February 2005, at Wichita, Kansas.


s/   Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE