**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| AMIE H. GARCIA, ) | |
| ) | |
| Plaintiff, ) | **CIVIL ACTION** |
| ) | |
| v. ) | No. 04-1159-MLB |
| ) | |
| THE ESTATE OF ROMEO ARRIBAS, ) | |
| M.D., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant Dr. Martin Sellberg's motion to strike the testimony of two of plaintiff's experts. (Doc. 122.) The motion has been fully briefed and is ripe for decision. (Docs. 123, 125, 132.) Sellberg's motion is GRANTED for reasons set forth herein.

**I. FACTS AND PROCEDURAL HISTORY**

This is essentially a continuation of a previous case, which was dismissed at the summary judgment stage. Garcia v. Polich, No. 00-1231-MLB, Doc. 383 (D. Kan. Jan. 30, 2004) (Garcia I). In that case, plaintiff invoked this court's subject matter jurisdiction based on a federal question arising under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. The court granted summary judgment to defendant St. Catherine Hospital on the EMTALA claim, and declined to exercise supplemental jurisdiction over the remainder of the case, which was based solely on state law claims related to medical malpractice. Garcia I. Subsequent to that ruling, the case was refiled with Traci Garcia's daughter, Amie Garcia, as the plaintiff. Amie resides in Texas; therefore, the case arises under

federal diversity jurisdiction. Unless otherwise noted, the following facts are based on Garcia I.[1]

Traci Garcia, plaintiff's decedent, had her third child by caesarian section on June 3, 1998 at Southwest Medical Center in Liberal, Kansas. Mrs. Garcia was discharged to home and approximately one week later, she began to experience multiple problems. On the morning of June 13, she went to the emergency room at Hamilton County Hospital in Syracuse, Kansas. Mrs. Garcia was admitted to Hamilton County Hospital by Dr. Romeo Arribas.

In the evening hours of June 13, Dr. Arribas contacted Dr. Ann Polich at St. Catherine Hospital in Garden City regarding Mrs. Garcia's situation. Dr. Polich told Dr. Arribas to send Mrs. Garcia directly to Wichita. This did not happen. Instead, Dr. Arribas called Dr. Polich again at approximately 2:00 a.m. on June 14. Dr. Arribas expressed his opinion that Mrs. Garcia could be cared for at St. Catherine. Dr. Polich agreed to accept Mrs. Garcia at St. Catherine upon her transfer from Hamilton County Hospital.

Mrs. Garcia arrived at St. Catherine at approximately 3:45 a.m. on June 14, where she was examined in the emergency room by William D. Strampel, D.O., an emergency room physician. Dr. Strampel's initial diagnosis was Adult Respiratory Distress Syndrome. He concluded that Mrs. Garcia's condition constituted an emergency and

---

[1] In relying on the facts found in Garcia I, the court expresses no opinion regarding whether Garcia I has any binding effect on this case. Rather, for sake of convenience, the court simply recounts its own factual summary as provided in Garcia I. It does not appear that these facts are seriously in dispute. In any event, should any party feel that reliance on facts from Garcia I is misplaced, they are free to raise the issue when and if it becomes appropriate.

that she needed to be admitted or transferred.  However, because Dr. Strampel was not authorized to admit or transfer Mrs. Garcia, that decision fell to the attending physician, Dr. Polich.

Dr. Strampel called Dr. Polich from the emergency room and reported the situation.  Dr. Polich immediately came to the hospital, arriving at 4:20 a.m.  She examined Mrs. Garcia, reviewed x-rays and available lab test results and spoke with Dr. Strampel.  Both physicians recognized that Mrs. Garcia's situation presented an emergency medical condition.  Plaintiff argues that Mrs. Garcia should have been intubated prior to transfer in order to stabilize Mrs. Garcia's condition.  Dr. Polich knew that if she elected to admit Mrs. Garcia, St. Catherine had the capability to intubate her.  In Dr. Polich's opinion, however, Mrs. Garcia needed complex ventilator management which was not within the capability of St. Catherine.  Plaintiff does not dispute Dr. Polich's judgment in this regard.  Dr. Polich determined that Mrs. Garcia was stable and almost immediately ordered her transfer by air to Via Christi Hospital in Wichita.  Via Christi agreed to accept Mrs. Garcia.  There is no issue regarding Via Christi's capacity to treat Mrs. Garcia.

Dr. Polich prepared an acute transfer certificate, which stated that the transfer was based on "further pulmonary evaluation" and that the risks of transfer were "accident/death."  Gregg Garcia, Traci's husband, was told by Dr. Polich that Mrs. Garcia could die.  Gregg signed the consent section of the certificate which read:

### Consent to Transfer

> I hereby consent to transfer to another medical facility. I understand that it is the opinion of the physician responsible for my care that the benefits of transfer

-3-

>outweigh the risks of transfer. I have been informed of the risks and benefits upon which this transfer is being made. I have considered these risks and benefits and consent to transfer. I consent to the release of information to the receiving facility and physician as deemed necessary.

In order to effect the transfer, Dr. Polich contacted EagleMed, an air ambulance service. EagleMed apparently had an air ambulance at the Finney County Airport. The aircraft was manned by defendants Douglas Landgraf and Lawrence McGowan, both of whom were registered nurses and mobile intensive care technicians. Sometime around 5:00 a.m. on June 14 Polich spoke by telephone with Landgraf and EagleMed's medical advisor, Dr. Sellberg. Polich informed Sellberg of Traci's condition, after which Sellberg gave Landgraf certain orders regarding Traci's treatment during transport to Wichita. Thereafter, Traci Garcia was transported to Finney County Airport via EMS. (Doc. 42 at 5-6.)

From the airport, Traci was flown to Wichita aboard an EagleMed aircraft. Unfortunately, during the flight she suffered a cardio-pulmonary arrest. Landgraf and McGowan attempted to intubate her, but were unable to secure an airway. They performed CPR on her for the remainder of the flight to Wichita, and the subsequent ground ambulance transport to Via Christi - St. Francis Hospital. Although Traci Garcia survived through June 14th, it appears that her brain function never returned. She was pronounced dead the following day. (Doc. 66 at 10.)

Plaintiff filed this medical malpractice action against Sellberg and other defendants, asserting claims of negligence, gross negligence, and wrongful death. (Pretrial Order, Doc. 124 at 31.)

-4-

In a previous order, the court ruled that Sellberg was statutorily immune from liability for ordinary negligence arising out of his actions in this case.  (Doc. 98 at 8.)  That immunity does not, however, extend to gross negligence.  Id. at 9.  Thus, in order to recover from Sellberg, plaintiff must show that he was grossly negligent in his treatment of plaintiff's decedent.

In the instant motion, Sellberg asks the court to strike the testimony of Jack Shearer and Dr. Ernest McClellan.  (Doc. 122.) Shearer is a certified registered nurse anesthetist who offers to opine on the performance of a number of defendants, including Sellberg.  (Docs. 123 at 4; 125 at 1.)  Sellberg asserts that Shearer, a nurse, is not qualified to give opinions regarding whether Sellberg, a medical doctor, deviated from the standard of care.  (Doc. 123 at 3.)  Plaintiff concedes that Shearer is not qualified to opine on Sellberg's performance.  (Doc. 125 at 1.)  Accordingly, Sellberg's motion is GRANTED as to Shearer's testimony regarding the doctor's performance.

Sellberg also asks the court to preclude Dr. McClellan from opining that Sellberg's performance amounted to gross negligence, recklessness, or wantonness.  (Doc. 123 at 7.)  Sellberg argues that this testimony is impermissible because McClellan is basically telling the jury what legal conclusion it should draw from the facts of the case.  Id. at 7-8. Plaintiff counters that Federal Rule of Evidence 704(a) expressly authorizes experts to testify to "ultimate issues." (Doc. 125 at 3.)  Although resolution of disputes regarding expert testimony almost always require a Daubert hearing, no hearing is required in this instance because Sellberg does not challenge the

qualifications of Dr. McClellan or the reliability of his methods. Instead, this motion presents what is essentially a pure question of law - whether a medical expert may opine that another doctor's performance amounted to gross negligence or wanton conduct.

## II. ANALYSIS

Federal Rule of Evidence 704(a) provides, in relevant part, that

> testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Nonetheless, "an expert may not state legal conclusions." Phillips v. Calhoun, 956 F.2d 949, 952 (10th Cir. 1992). Likewise, the Federal Rules do not "allow an expert to offer testimony that merely tells the jury what result they should reach." United States v. Simpson, 7 F.3d 186, 188 (10th Cir. 1993). Stated another way, "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1328 (10th Cir. 1998)

That seems to be precisely what Dr. McClellan is attempting to do here. He offers the opinion that "the care provided by Dr. Sellberg and Eagle Med to Traci Garcia not only fell below the standard of care expected of an air ambulance service, it was grossly negligent and showed a reckless disregard for her life." (Doc. 123 exh. D at 2.) By opining that Sellberg was grossly negligent and reckless, he is directly telling the jury the legal conclusion that they should draw from the facts. Although Rule 704(a) allows expert testimony that "embraces an ultimate issue," the case law interpreting that rule, supra, shows that there are limits to this otherwise

-6-

liberal evidentiary rule.

The wisdom of these limits is apparent from this very case. In order to prove ordinary medical negligence, the plaintiff must establish the applicable standard of care, then show that the defendant deviated from that standard, and that this deviation caused the plaintiff's injuries. A jury of lay persons is not capable of ascertaining any of these elements on their own. Instead, one or more qualified medical experts is required to provide testimony in order to prove each element. Medical experts are routinely allowed to testify directly to the ultimate issues of standard of care, deviation, and causation, because the jury cannot otherwise determine whether these elements have been met, and because medical experts are uniquely qualified to opine on these issues.

By contrast, the standards for gross negligence and/or wantonness may involve more than just the aforementioned technical issues. As noted in a previous order, the court has not yet been called on to formally decide the legal standards for gross negligence (Doc. 98 at 11), and it need not do so here. Assuming that gross negligence equates to wantonness, "[a]n act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act." PIK-Civil 3d § 103.03. This definition focuses on Sellberg's state of mind at the time of the incident. This is a legal question, not a medical question. Although Dr. McClellan is qualified to render certain medical opinions, he is no more qualified than the members of the jury to opine on these purely legal, as opposed to medical, conclusions. Thus, the wisdom of the case law prohibiting

this type of testimony is self-evident.

Alternatively, assuming that gross negligence is not synonymous with wantonness, but simply refers to the degree of departure from the standard of care, Dr. McClellan would still be prohibited from telling the jury that any particular degree of departure amounts to gross negligence. Again, that amounts to applying the law to the facts in an effort to tell the jury the conclusion it should reach - a practice expressly forbidden in this circuit. See Okland Oil Co., 144 F.3d at 1328. Moreover, Kansas law has recognized that even judges and lawyers struggle with the concept of degrees of negligence. Mo. Pac. Ry. Co. v. Walters, 78 Kan. 39, 40-41, 96 P. 346, 347 (1908). It was for that reason that degrees of negligence were abolished in this state. Id. If the concept of gross negligence is difficult for legal experts, such as the able counsel representing the parties in this case, there would seem to be little wisdom in allowing Dr. McClellan, a layman to the law, to offer an opinion regarding whether Sellberg's performance dipped to this abysmal level.

In sum, Dr. McClellan will not be permitted to offer an opinion that Sellberg's performance was grossly negligent, reckless, or wanton. However, this decision should not be interpreted as striking his testimony in total. Rather, he will be permitted to testify regarding standard of care, causation, and the degree to which he believes Sellberg departed from the standard of care.[2] Contrary to plaintiff's assertions, this ruling does not prevent him from

---

[2] This assumes that Dr. McClellan has formed these opinions and that plaintiff has complied with the rules for informing defendants of the opinions being offered.

-8-

establishing a prima facie case of gross negligence. (Doc. 125 at 3.) It merely means that he will likely have to rely on Dr. McClellan's testimony regarding the degree of departure from the standard of care in order to argue to the jury that such a departure shows the mental state or degree of negligence necessary to a finding of gross negligence.

A motion for reconsideration of this order under Local Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>. The response to any motion for reconsideration shall not exceed three pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this __21st__ day of November 2005, at Wichita, Kansas.

s/   Monti Belot<br>
Monti L. Belot<br>
UNITED STATES DISTRICT JUDGE