**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| AMIE H. GARCIA, ) | |
| ) | |
| Plaintiff, ) | **CIVIL ACTION** |
| ) | |
| v. ) | No. 04-1159-MLB |
| ) | |
| THE ESTATE OF ROMEO ARRIBAS, ) | |
| M.D., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on the following motions regarding expert testimony:

> 1) Plaintiff's motion to strike the alternate causation defense of pre-eclampsia. (Docs. 167, 203.) Various defendants filed responses. (Docs. 215, 229, 235, 242.)
>
> 2) Plaintiff's motion to strike expert Adams (Doc. 168). Defendant Sellberg responded. (Doc. 218.)
>
> 3) Plaintiff's motion to strike defendant Polich's expert pathologist (Doc. 170). Defendants Sellberg and Polich responded. (Docs. 216, 245.)
>
> 4) The Estate of Arribas' motion to preclude the use against it of depositions of Arribas taken in the prior case. (Doc. 194, 195.) Various responses have been filed. (Docs. 208, 219, 236.)

Additionally, two reply briefs were filed, and plaintiff sought leave to file a third reply. (Docs. 240, 246, 248.) With respect to motions in limine, the pretrial order only authorizes a supporting brief and a response. (Doc. 124, Pretrial Order (PTO) at 66.) The

pretrial order specifically states that "[r]eply briefs in support of motions in limine shall not be allowed without leave of court." The parties did not seek leave to file two of the replies. (Docs. 240, 246.) Those briefs are accordingly STRICKEN from the record. The court finds that the third reply, the one for which plaintiff requested leave to file, is essentially moot based on the disposition of the underlying motion. Therefore, plaintiff's motion for leave to file a reply (Doc. 248), is DENIED.

## I. FACTS AND PROCEDURAL HISTORY

This is essentially a continuation of a previous case, which was dismissed at the summary judgment stage. Garcia v. Polich, No. 00-1231-MLB, Doc. 383 (D. Kan. Jan. 30, 2004) (Garcia I). In that case, plaintiff invoked this court's subject matter jurisdiction based on a federal question arising under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. The court granted summary judgment to defendant St. Catherine Hospital on the EMTALA claim, and declined to exercise supplemental jurisdiction over the remainder of the case, which was based solely on state law claims related to medical malpractice. Garcia I. Subsequent to that ruling, the case was refiled with Traci Garcia's daughter, Amie Garcia, as the plaintiff. Amie resides in Texas; therefore, the case arises under federal diversity jurisdiction. Unless otherwise noted, the following facts are based on Garcia I.[1]

---

[1] In relying on the facts found in Garcia I, the court expresses no opinion regarding whether Garcia I has any binding effect on this case. Rather, for sake of convenience, the court simply recounts its own factual summary as provided in Garcia I. It does not appear that these facts are seriously in dispute. In any event, should any party feel that reliance on facts from Garcia I is misplaced, they are free

Traci Garcia, plaintiff's decedent, had her third child by caesarian section on June 3, 1998 at Southwest Medical Center in Liberal, Kansas. Mrs. Garcia was discharged to home and approximately one week later, she began to experience multiple problems. On the morning of June 13, she went to the emergency room at Hamilton County Hospital in Syracuse, Kansas. Mrs. Garcia was admitted to Hamilton County Hospital by Dr. Romeo Arribas.

In the evening hours of June 13, Dr. Arribas contacted Dr. Ann Polich at St. Catherine Hospital in Garden City regarding Mrs. Garcia's situation. Dr. Polich told Dr. Arribas to send Mrs. Garcia directly to Wichita. This did not happen. Instead, Dr. Arribas called Dr. Polich again at approximately 2:00 a.m. on June 14. Dr. Arribas expressed his opinion that Mrs. Garcia could be cared for at St. Catherine. Dr. Polich agreed to accept Mrs. Garcia at St. Catherine upon her transfer from Hamilton County Hospital.

Mrs. Garcia arrived at St. Catherine at approximately 3:45 a.m. on June 14, where she was examined in the emergency room by William D. Strampel, D.O., an emergency room physician. Dr. Strampel's initial diagnosis was Adult Respiratory Distress Syndrome. He concluded that Mrs. Garcia's condition constituted an emergency and that she needed to be admitted or transferred. However, because Dr. Strampel was not authorized to admit or transfer Mrs. Garcia, that decision fell to the attending physician, Dr. Polich.

Dr. Strampel called Dr. Polich from the emergency room and reported the situation. Dr. Polich immediately came to the hospital,

---

to raise the issue when and if it becomes appropriate.

-3-

arriving at 4:20 a.m. She examined Mrs. Garcia, reviewed x-rays and available lab test results and spoke with Dr. Strampel. Both physicians recognized that Mrs. Garcia's situation presented an emergency medical condition. Plaintiff argues that Mrs. Garcia should have been intubated prior to transfer in order to stabilize Mrs. Garcia's condition. Dr. Polich knew that if she elected to admit Mrs. Garcia, St. Catherine had the capability to intubate her. In Dr. Polich's opinion, however, Mrs. Garcia needed complex ventilator management which was not within the capability of St. Catherine. Plaintiff does not dispute Dr. Polich's judgment in this regard. Dr. Polich determined that Mrs. Garcia was stable and almost immediately ordered her transfer by air to Via Christi Hospital in Wichita. Via Christi agreed to accept Mrs. Garcia. There is no issue regarding Via Christi's capacity to treat Mrs. Garcia.

Dr. Polich prepared an acute transfer certificate, which stated that the transfer was based on "further pulmonary evaluation" and that the risks of transfer were "accident/death." Gregg Garcia, Traci's husband, was told by Dr. Polich that Mrs. Garcia could die. Gregg signed the consent section of the certificate which read:

### Consent to Transfer

> I hereby consent to transfer to another medical facility. I understand that it is the opinion of the physician responsible for my care that the benefits of transfer outweigh the risks of transfer. I have been informed of the risks and benefits upon which this transfer is being made. I have considered these risks and benefits and consent to transfer. I consent to the release of information to the receiving facility and physician as deemed necessary.

In order to effect the transfer, Dr. Polich contacted EagleMed, an air ambulance service. EagleMed apparently had an air ambulance

at the Finney County Airport.  The aircraft was manned by defendants Douglas Landgraf and Lawrence McGowan, both of whom were registered nurses and mobile intensive care technicians.  Sometime around 5:00 a.m. on June 14 Polich spoke by telephone with Landgraf and EagleMed's medical advisor, Dr. Sellberg.  Polich informed Sellberg of Traci's condition, after which Sellberg gave Landgraf certain orders regarding Traci's treatment during transport to Wichita.  Thereafter, Traci Garcia was transported to Finney County Airport via EMS.  (Doc. 42 at 5-6.)

From the airport, Traci was flown to Wichita aboard an EagleMed aircraft.  Unfortunately, during the flight she suffered a cardio-pulmonary arrest.  Landgraf and McGowan attempted to intubate her, but were unable to secure an airway.  They performed CPR on her for the remainder of the flight to Wichita, and the subsequent ground ambulance transport to Via Christi - St. Francis Hospital.  Although Traci Garcia survived through June 14th, it appears that her brain function never returned.  She was pronounced dead the following day. (Doc. 66 at 10.)

**II. ANALYSIS**

A.  MOTION TO STRIKE PRE-ECLAMPSIA DEFENSE

Plaintiff contends that defendants failed to preserve "the alternate causation defense" of pre-eclampsia in the pretrial order. Accordingly, she argues, defense experts Moore and Ridgway should be prohibited from testifying that Traci Garcia's death was caused by pre-eclampsia, or that this condition in any way contributed to her demise.  (Doc. 167 at 11-12.)  Moore was retained by defendants Landgraf and McGowan, while Ridgway was retained by the Estate of

Arribas.

Various interested defendants responded, and generally pointed to several places in the pretrial order where pre-eclampsia was discussed. For instance, Polich made a passing reference to pre-eclampsia in her contentions. (PTO at 9.) Similarly, Sellberg essentially parroted Polich's pre-eclampsia statement in his contentions. Id. at 18. Addressing the matter in more detail, the Estate discussed pre-eclampsia twice in its contentions:

> [Traci Garcia] suffered from pre-eclampsia, but was diagnosed by Dr. Knudsen and Dr. Patron with "nephrotic syndrome." The diagnosis of nephrotic syndrome, although incorrect, because it did not account for the elevated blood pressure, nevertheless correctly recognized Ms. Garcia's heavy proteinuria and significant edema.
>
> . . . .
>
> The patient suffered from an undiagnosed and rare condition, known as late postpartum pre-eclampsia. Ultimately, her death was precipitated by the existence of the late postpartum pre-eclampsia, which was the cause of her adult respiratory distress syndrome (ARDS), which was the reason why she required intubation. Intubation was unsuccessful, and she suffered severe brain damage.

Id. at 27, 30 (emphasis added).

Plaintiff argues that these references to pre-eclampsia in the pretrial order are insufficient to preserve the issue for trial. Indeed, she claims that she has been led to believe, since the time the pretrial order was filed, that she would not need to address any claim that pre-eclampsia was involved in Traci Garcia's death. Thus, plaintiff claims that she will be prejudiced by this eleventh-hour revival of the pre-eclampsia matter.

However, plaintiff's surprise is belied by a number of facts,

-6-

not the least of which is that, in this same pretrial order, she specifically "denie[d] that Traci Garcia's death was caused by pre eclapmsia [sic]." (PTO at 45.) There can be no doubt that plaintiff was on notice that pre-eclampsia was an issue in the case, else she would not have included such a clear statement of denial in the pretrial order.  Moreover, the record indicates that both Moore and Ridgway submitted expert reports suggesting that pre-eclampsia played a role in Traci Garcia's death.  (Doc. 167 at 2-3.)  Plaintiff was obviously aware of those reports.

As to plaintiff's argument that, by failing to specifically list pre-eclampsia as an "alternate causation defense," defendants have abandoned this issue, the court notes that causation is not a defense, it is part of a prima facie case of medical negligence.  Though not listing every possible means by which the chain of causation might be broken, defendants have adequately maintained that causation is an issue in this case.  (PTO at 45, 47-48, 51, 53, 54, 56.)  Plaintiff's motion is accordingly DENIED.

B.  PLAINTIFF'S MOTION TO STRIKE SELLBERG'S EXPERT, DR. ADAMS

Plaintiff argues that Sellberg belatedly designated Dr. Adams as an expert witness.  (Doc. 168.)  Sellberg responds that he does not intend to call Adams unless one of his other experts becomes unavailable.  Plaintiff's motion is DENIED without prejudice to reassertion at such time, if ever, that Sellberg attempts to call Dr. Adams.

C.  PLAINTIFF'S MOTION TO STRIKE POLICH'S EXPERT, DR. OXLEY

Plaintiff seeks to strike Dr. Oxley, Polich's expert pathologist based on a loss of evidence which was entrusted to the doctor.  The

-7-

parties agree that tissue samples were taken from Traci Garcia's body during an autopsy. Those samples were also used to make microscopic slides for pathological studies of the decedent. Plaintiff provided the tissue samples to her expert pathologist, Dr. Grover Hutchins. Dr. Hutchins analyzed the slides and rendered an expert opinion. Following his deposition in January of 2000, the slides and tissue samples were given to Polich's counsel, who provided them to Polich's expert, Dr. Dwight Oxley. (Doc. 170 at 1-2.)

In April of 2002, Dr. Oxley issued his expert report; however, he was not deposed until January of 2005. Finally, on February 21, 2006, plaintiff's counsel requested that Polich's counsel return the tissue samples and slides. Unfortunately, no one has been able to find these materials. Id. at 2-4.

Plaintiff now requests sanctions against Polich for spoliation of evidence. She requests that the court consider striking Dr. Oxley as a witness and giving an adverse inference instruction to the jury. Id. at 1, 5. Plaintiff also makes a passing request that the court enforce a subpoena against a non-party, Via Christi Medical Center; however, beyond this bare request, plaintiff fails to provide much elaboration on this point, leaving the court to wonder what it is being asked to enforce. Id. at 1, 3.

When considering sanctions for spoliation of evidence, the court considers the degree of culpability of those involved, and "whether the evidence was relevant to proof of an issue at trial." Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 862-63 (10th Cir. 2005) (citing Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997)). "Mere negligence in losing or destroying [evidence] is

not enough [to justify an adverse inference instruction] because it does not support an inference of consciousness of a weak case." Aramburu, 112 F.3d at 1407.

Regarding culpability, there can be no doubt that Polich was responsible to see that evidence possessed by her expert was properly preserved. She bears responsibility for her expert's mistakes. Nevertheless, plaintiff concedes that there is no evidence of bad faith. (Doc. 170 at 5.) Thus, at most, we are faced with loss of evidence through Dr. Oxley's negligence. Even that conclusion is speculative inasmuch as Dr. Oxley apparently believes that he returned the materials to the Wesley Medical Center pathology department for subsequent transfer to Via Christi Medical Center. (Doc. 245 at 2-3.) Thus, any loss may have been due to mixups with hospital staff at Wesley, Via Christi, or couriers in between. However, there is no suggestion that anyone purposefully destroyed the materials.

Moreover, the court notes that plaintiff waited almost four years from the time Dr. Oxley completed his expert report before requesting these materials from Polich's counsel. This request was finally levied less than sixty days prior to trial. The court finds that plaintiff's tardiness in securing the materials has helped create a crisis where one might not have existed had she collected the samples shortly after Dr. Oxley finished his examination. Back then, everyone's recollection of events would have been fresher, and the ability to find misplaced materials might have been easier. Now, no one knows for sure what happened, and Dr. Oxley is only relying on his past pattern and practice, rather than a specific recollection of his actions in this particular case. Therefore, the court finds that

plaintiff must also bear some culpability for her dereliction in this matter.

As to prejudice, the court finds very little.  Unlike other cases where sanctions for spoliation of evidence have been imposed, plaintiff's expert had an opportunity to review these materials and prepare his report.  See, e.g., Workman v. AB Electrolux Corp., 2005 WL 1896246, *4 (D. Kan. Aug. 8, 2005) (truck, which was possible source of fire in products liability action, was destroyed before some parties were able to examine it); Kindergartners Count, Inc. v. DeMoulin, 209 F.R.D. 466, 468 (D. Kan. 2002) (party's delay in producing phone records resulted in their destruction without the opposing party ever having a chance to review the records).  Here, plaintiff's alleged prejudice is that Dr. Hutchins will not be able to refresh his memory of the case with the actual slides; that plaintiff cannot produce demonstrative exhibits from the slides; and that she will be unable to have her expert rebut opinions put forth by Dr. Oxley. (Doc. 170 at 5-7.)  The court finds minimal prejudice resulting from the first two scenarios.  If plaintiff wanted to produce demonstrative exhibits, she had an opportunity to do so years ago.  Poor planning on her part does not translate into a crisis for everyone else.  The same is true for Dr. Hutchins' ability to refresh his recollection of the case.  He has his report and any notes he created.  While that may not be perfect, it will have to be enough.

The only issue that may have merit is plaintiff's inability to rebut opinions offered by Dr. Oxley.  The court cannot speculate on exactly what Dr. Oxley might say; therefore, resolution of this issue must wait until trial.  However, the court notes that plaintiff has

deposed Dr. Oxley, and has had four years in which to consider how she might counter any opinions raised in his 2002 report. Plaintiff's motion is accordingly DENIED.

D.  USE OF THE ARRIBAS DEPOSITIONS FROM GARCIA I.[2]

The Estate of Arribas argues that depositions of Arribas taken in Garcia I may not be used against the Estate in this action. The arguments for and against this position are nuanced and, on the eve of trial, the court will not digress into a long dissertation on the subject. The outcome of this motion is governed by Federal Rule of Civil Procedure 32(a), which provides, in relevant part, as follows:

> **Use of Depositions.** At the trial . . . any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
>
> . . . .
>
> (2) The deposition of a party . . . may be used by an adverse party for any purpose.
>
> (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
>     (A) that the witness is dead.

According to the introductory paragraph of Rule 32(a), a deposition may be used against "any party who was present or represented at the taking of the deposition." The court finds that the term "party" refers to an individual's status at the time the deposition is offered against him, not at the time that the deposition

---

[2] Since the Estate settled out of the case today, this motion may be moot. To the extent it is still alive based on the claims of comparative fault, this section applies.

was taken. <u>Codeiro v. Levasseau</u>, 112 F.R.D. 209, 210 (D.R.I. 1986). Thus, the fact that Arribas was not a party at the time his deposition was taken is irrelevant.

Next, the court takes the unremarkable step of concluding that, as Arribas' successor in interest, the Estate and Arribas are synonymous for purposes of Rule 32(a). In other words, the Estate has no greater rights than Arribas would have if he were a party to this suit. Since Arribas was "present" at the taking of his deposition, the initial requirements for admission of the deposition under Rule 32(a) are met. The only question remaining is whether the deposition is admissible under any of Rule 32(a)'s numbered subparagraphs. The deposition is clearly admissible under subparagraph (2) or (3). Since the Estate is a party, and has no greater rights than Arribas would have, Rule 32(a)(2) applies to allow all the adverse parties to use his deposition for any purpose. Likewise, Rule 32(a)(3) applies to allow any party to use the deposition for any purpose because the witness, Arribas, is dead. The Estate's motion is therefore DENIED.

IT IS SO ORDERED.

Dated this   31st   day of March 2006, at Wichita, Kansas.

s/   Monti Belot    
Monti L. Belot  
UNITED STATES DISTRICT JUDGE